Sneed, J.,
delivered the opinion of the court, McFarland and Freeman, J.J., concurring.
The relator, by bill filed in the Circuit Court of Shelby county on the 13th day of April, 1870, invokes the aid of the court in ousting the defendant from the office of sheriff of said county, which he is charged to have seized upon, and usurped without warrant of law, and to which the relator claims title under an election by the people on the 26th of March, 1870, alleged to be valid. The proceeding *239 is upon information in the nature of a quo warranto under a statute of this State, authorizing “proceedings against corporations in the name of the State, and to prevent the usurpation of office.” The action lies under said statute in the name of the State whenever any person unlawfully holds any public office or franchise within this State, or any office in any corporation created by the laws of this State: Code, secs. 3409 et seq. The statute among other provisions, contains the following: “Whenever the action is brought against a person for usurping an office, in addition to the other allegations, the name of the person rightfully entitled to the office, with a statement of his right thereto, may be added, and the trial should, if practicable, determine the right of the contesting parties: 3419. If judgment is rendered in favor of such claimant, the court may order the defendant to deliver to him, upon his qualifying as required by law, all books and papers belonging to the office, in his, the defendant’s, custody, or under his control, and such claimant may thereupon proceed to exercise the functions of the office: 3420. Such claimant, in this event, may also, at any time within one year thereafter, bring suit against the defendant, and recover the damages he has sustained by reason of the act of the defendant: 3421. The validity of any election which may be contested under this Code, cannot be tried under the provisions of this chapter: 3423. The bill will set forth briefly and without any technical ‘ forms, the ground upon which the suit is instituted, and the suit will be conducted as other suits in equity: 3415. The court *240 may, during the progress of the cause, grant such extraordinary process as may be necessary, and make all such orders, rules and decrees, according to the practice of a court of chancery, as may be necessary to accomplish the objects had in view: 3417. The bill may be filed either in the Circuit or Chancery Court of the county in which the office is usurped or held: 3411.” In the case now in judgment, the bill was originally filed in the Circuit Court, but during the progress of the cause was transferred to the Chancery Court, the Judge of the Circuit Court having been of counsel in the cause. The litigation was ended in the Chancery Court by a final judgment of ouster against the defendant, and a decree declaring the relator entitled to the office, and directing the coroner of the county to execute the judgment of ouster and investiture. The constitutional term of the office of sheriff, in this State, is two years. The defendant was inducted into office on the day of April, 1870. The final decree below was rendered on the 14th day of February, 1871, and to reverse this decree the defendant appealed to the last term of this court, but the cause was not reached upon the docket until the present term.
Under the Constitution of 1870, the next election for the office of sheriff will transpire on the first Thursday in August, 1872. So that the termination of this controversy, so far as the actual enjoyment of the office and the exercise of its functions are concerned, can now be of little practical importance to *241 the relator, but in other respects it involves consequences to both parties which impose upon us the most careful consideration of the questions involved. And it would be well before we advert to the facts of the case — upon which rest the present equities of the parties — to dispose of a question of law which confronts us at the threshold, and which has been pressed by the counsel for the defendant with apparent confidence and with great ability. It is urged on behalf of the defendant that this proceeding, by information in the nature of a quo warranto, is not an appropriate or legitimate remedy to get possession of an office, the right to which may be contested under the laws of this State, that the office of sheriff is one which, under the law, may be contested, and that the remedy by quo warranto is, in such ease, expressly excluded by the terms of the statute. And a cursory reading of the particular section relied on, would seem to give force and plausibility to this position. That section has already been quoted and is in the words following: “The validity of any election which may be contested under this Code, cannot be ' tried under the provisions of this chapter.”
It may be observed . that the remedy given by the statute to recover a- public office, and to prevent the usurpation of office, though denominated a quo warranto or an information in the nature thereof, is of much greater scope and vigor than the ancient writ, and, indeed is a peculiar and and very different remedy. The pleadings under the ancient proceeding were curious and anomalous. The *242 plaintiff, in an ordinary case, was required upon the face of his plaint, and in his proof, to make a case against the defendant. But under this ancient remedy the order was reversed. The King or the State was not bound to show anything, but the defendant was bound to show that he had a right to the office, and if he failed to show authority, judgment was given against him: 4 Burr, 2146; Ang. and Ames Corp., 636. The old writ, it is said, was never in force in this country, and it is said that the information was a thing unknown to our practice: Martin and Yerg., 279; 9 Hum., 755. As against corporations the remedy was by seire facias and the injunctive powers of a court of equity. But yet, there seems to be some conflict of ruling in our court, as to the existence of the ancient remedy prior to the act of 1846, chap. 55, which, as originally enacted, only applied to corporations and corporate franchises, but to which is superadded in the Code, the remedy against the usurpation of any public office. Thus, in the case of Bradly v. Commissioners, decided in this court in 1841, which was a proceeding by bill in equity to enjoin perpetually the organization of a county, it was insisted in argument that the true remedy was by writ of quo warranto, and not by injunction; when Judge' Turley admitted that the quo warranto was the common law remedy for redressing such a grievance, and it was the only one that could be used, before the system of chancery jurisprudence was established upon its present Jbroad basis. But the learned Judge thought the ancient remedy in such *243 case insufficient, because the quo warranto was not a prohibitory writ, and before the question arising under it could be determined, great mischief might be done. He, therefore, concluded that if the courts had the power to remedy the evil, that remdy, which will be. most effectual, is the remedy which ought to be resorted to: 2 Hum., 432. But it would be unprofitable to inquire whether or not the ancient writ was ever in force here, further than its history may tend to aid in the construction of our statutes. It was known as a writ by which the government began its action to recover an office or franchise from the person or corporation in possession of it. It merely commanded the sheriff to summon the defendant to appear and show cause by what warrant he claimed the office. And it was a writ of right — a civil remedy to try the mere right to the office or franchise where the person in possession never had a right to it: 3 Shars., Bl. Com., 262, 263. But the action was regulated by the statute of Gloster: 6 Edw., 1; which was regarded as a limitation upon the King’s prerogative. Prior thereto, the King, by virtue of the royal prerogative, sent commissions into all parts of the kingdom to inquire into the right of all franchises, because they were grants from the crown, and if no charter could be shown, the franchise was seized without any judicial proceeding. The information thus sprung from this obsolete writ, and is best defined in the words of statute Anne, ch. 20, which provides that “if any person or persons shall usurp or intrude into, or unlawfully hold or execute, the *244 offices of bailiffs, mayors, port 'reeves or other offices, or the franchise of burgesses or freemen in any city, town corporate, borough or place, within England or Wales, it shall be lawful for the proper officer of the court of Queen’s bench, the courts of sessions of counties palatine, and the courts of grand sessions in Wales, with the leave of the said courts, respectively to exhibit one or more information or informations in the nature of a quo warranto, at the relation of any person or persons desiring to sue or prosecute the same, and who shall be mentioned in such information or informations to be the relator or relators against such person or persons so usurping, intruding into, or unlawfully holding and executing any of the Said offices or franchises, and to proceed therein in such manner as is usual in cases of informations in the nature of quo warranto.” These statutes made a great stride toward English liberty and the limitation of the royal prerogative, but the writs were issued under the sanction of courts of law •, they were not prohibitory writs, and they still lacked the remedial vigor which has been superadded to our kindred remedy by engrafting upon it the flexible and subtle attributes which belong to equity jurisprudence. It is something more then, than the ancient writ, and whether initiated in a court of lajv or a court of equity, it is, nevertheless, made an “ equity proceeding,” and carries along with it all the vast remedial incidents of a court of equity, by injunction and otherwise. If, therefore, a strong case for relief is apparent upon the face of the bill, it would demand something more *245 than a mere technical barrier to defeat the remedy. The bill in this ease does not impugn the election itself, but on the contrary, it insists upon its fairness and legality, and proceeds alone upon the assumption of its validity. It assumes that the relator had been elected, and that the fact of his election had been authenticated in the manner prescribed by law, and that the defendant by a fraudulent collusion and combination with the returning officer, seized upon and usurped the office, and now holds and enjoys its emoluments and is performing its functions. The defendant denies the fraudulent collusion, but admits-that by the vote and the poll-book and by a certificate of election issued by the proper officer the relator did actually have a majority of the votes cast, but that this officer, by rejecting a certain number of votes in a certain ward of the city of Memphis, found upon subsequent computation that defendant was elected, and issued a certificate to him, upon which he was inducted into office. If the returning officer was authorized by • law to adjudicáte the validity of the election — to reject or retain such votes as he pleased — and in the exercise of this judicial function had given the office to the defendant, in the manner indicated, then this would present a case where the relator would have the right to contest the election according to law. But if the returning officer has no such power, if this proceeding on his part has been arbitrary and without warrant of law, then the relator, upon his bill, and upon the answer of defendant, has made out his prima faoie case of lawful *246 election and title to the office, and it is not a case which may be contested, because he has nothing to contest. The source and fountain of all elective offices in this State, is in the election itself. The votes of the people confer the title; the certificate, the induction or actual possession of the office do not confer the title. These things are the mere indicia to the right, but not the right itself.
Thus it is said by Ch. J. Cooly, that “if anyone, without the requisite vote of the people, intrudes into an office, whether with or without a certificate of election, the courts have jurisdiction to oust him.”' Cooly Constitutional Lim., 624. “A public office,” says Sir Wm. Blaekstone, “is a right to exercise a public employment and to take the fees and emoluments thereunto belonging.”' 2 Bl. Com. 271, 272. The right is one thing, and the paraphernalia another. The certificate, the induction, the actual possession may all exist in a usurper of the office. The title must be deraigned at last from the sovereign power. We cannot too much magnify this principle, for it is the chief corner-stone of all popular governments. The question turns then upon the powers and functions of the returning officer. For it is scarcely necessary to observe that if it be true that the relator received at the election, 176 majority of the votes actually cast, as alleged in the bill, as admitted by the answer, and as shown in the proof, then it is an election, and a result that cannot be contested by him, unless for the. purpose of defeating himself. The contest of an election is one thing, and the con *247 test of the right of a party to bold an office may be a totally different thing. The statute says, the validity of no election which may be contested under this Code, shall be tried under the provisions of this chapter: see. 3423. Now, the sheriff’s election is certainly one of those which may be contested under “ this- Code.” But that is not the question here. The question is: Was the remedy of the relator by a contest, or by the remedy he had adopted. - The contest attacks the election itself and not the proceedings subsequent thereto, as the certificate and induction. The contest presupposes a prima fade title in the party defendant, but upon the ground of irregularity and, frauds at the ballot-box itself, assumes that upon a purgation of the polls, a maj.ority of the legal votes were cast for the contestant and against the defendant, who claims the office. The title is to be determined by the ballot upon a contest, and not by the certificate or the act of induction. Hence the right of contest is intended to be confined, not upon him for whom the largest ballot has been cast, for prima faeie. the office is already his by the voice of the electors, which is the sole fountain of title. But the contest is upon him who has failed of this prima fade title.
The presumption is in favor of the validity of an election held under the forms of law. That presumption stands for a conclusion until rebutted by proof upon a contest.
The question then becomes a judicial one, to be determined by the appropriate tribunal. The return *248 ing officer may be a witness of the frauds and irregularities which would invalidate the election, but he cannot be the judge of them. The contest of the act of a returning officer in withholding the certificate of election from him who received the actual majority of the vote, and. awarding it to him who received a minority, is not a contest of the election.
The relator is not complaining of the election. He claims to have been elected, and the proof shows that he was actually elected. The contest must therefore come from the other side and not from him. It is not an election that he can be heard to contest, and it is not an election that may be contested under the law, so far as he is concerned.
The question in such a case, says Chief Justice Cooly, is, first, has there been an election, and second, was the party who has taken possession of the office the successful candidate at such election, by having received the majority of the legal votes cast.
These are questions which involve mixed considerations of law and fact, and the proper proceeding to try them is by quo warranto, where no special statutory tribunal is created for the purpose. 17 Illinois, 167; Cooly Const. Lim., 625. I apprehend that the statute should be construed as if it read, “ the validity of any election which may be contested under this Code, by the party who seeks this remedy, cannot be tried under the provisions of this chapter.” Vid. People v. Holden, Brightly’s Leading Election Cases, 481, If the relator in this case had resorted to the remedy by contest, his petition would have necessarily shown *249 the fact that a majority of the votes actually given were cast for him. This was an election, and he would have been very properly repelled by the answer, that being the elected candidate, and having the clear right to the office by the actual popular vote, he had not adopted the appropriate remedy to recover thé office.
We have seen that the merits of the cause do not turn upon the validity of the election, but upon the prima facie title which had been established- at the polls. And whatever may be our conclusion upon the merits, we decide nothing that can interfere with the defendant’s right in a proper proceeding still to' contest the prima facie case which the proof has established in behalf of the relator. The validity of the election is not involved iu this controversy, but only the relator’s prima facie title to the office. We are aware of no statute of limitations which bars the right to contest the election of sheriff in this state. It is held that an information like this may be filed after the expiration of the term of office. 2 Jones, North Carolina, 124. And such would be an appropriate proceeding when a party had been wrongfully deprived of the emoluments of an office to which he was prima facie entitled, that he might, if successful in that proceeding, recover damages in the proper form of action. While on the other hand, the defendant in such proceeding might show by contest that the prima facie title was false and illusory, and thus defeat his action. And it only remains for us to declare the judgment of the law upon the case made in the record. And *250 to that end it is necessary briefly to refer to undisputed facts of the case.
At an election held for sheriff of Shelby county, on the 26th day of March, 1870, the relator and the defendant were the only opposing candidates. The judges and clerks of the election, as required by law, made their returns to a commissioner of registration, who, under the then existing laws, was the returning officer. He compared the polls, and summed up the result, which showed the election of the relator by a clear majority of one hundred and seventy-six votes. He thereupon made out a certificate of election for the relator, but for some reason unexplained it was not delivered. On the first Monday'of April, thereafter, the commissioner made his returns of the election to the County Court., showing that the relator had received a majority of one hundred and seventy-six votes, and ' marked opposite his name, the word “elected.” On the 28th of March, 1870, the defendant filed his petition in the Circuit. Court, contesting the election of the relator, and obtained an injunction restraining the commissioners from issuing a certificate of election to the relator. The petition admits the majority of the relator, but alleges that he received many illegal votes, and that in the city of Memphis polls were opened improperly in the Tenth ward. It makes the commissioner and the relator defendants, and prays that petitioner be allowed to contest the election. On the 9th of April thereafter, the relator, Curry, appeared before the County Court, produced the official returns which had been filed by the commissioner on *251 the 5th of April, and demanded to be inducted into office. The County Court continued the matter until the 12th of April, and on the 13th of April refused the application. On the 13th of April the commissioner produced before said court a paper which he styled an amended return, and he was allowed to file it. This amended return is precisely like that of the 5th of April, except that the word elected is not put opposite the relator’s name, and at the foot of the paper is appended the following .statement, signed by said commissioner:
“I reject the returns made to me from the Tenth ward of the city of Memphis for the reason that there is no voting place legally established in said Tenth ward. Throwing out the vote of the Tenth ward, I deduct from the aggregate vote of A. P. Curry, four hundred and two, which leaves his aggregate in the county four thousand three hundred and ninety-one. I also deduct forty-nine votes from M. J. Wright, which leaves his aggregate vote in the county four thousand five hundred and seventy-eight, making the majority for Wright one hundred and seventy-seven votes.”
This amended return leaves the vote of all other candidates, except the candidates for sheriff, precisely the same as it stood in the original.' The Tenth ward vote is rejected as to no other candidate in the general election held that day. It is counted for tax collector, trustee, county court clerk, circuit court clerk, and for every other county or district officer, and excluded only as to the office of sheriff. It appears that the can *252 didate for clerk of the First Circuit Court was actually elected by the vote of the Tenth ward, and without it would have been defeated, but the commissioner gave him a certificate, and he was inducted into office and has continued to hold the same without question. The County Court allowed the commissioner to file this amended return, excluding only the''relator’s votes, and thereupon inducted defendant into office. The defendant thereupon dismissed his contest in'the Circuit Court.
Upon' this state of facts it is insisted that the defendant is the lawful sheriff of Shelby county. We cannot bring our minds to this conclusion. In the absence of an adjudication upon the validity of the election, we can only determine upon the prima faeie title, and that, in our judgment, is in the relator. And no testimony which would tend to rebut this prima facie title upon the ground of fraud, illegal voting, or other irregularities which might defeat the election upon a contest, could be heard in this proceeding. The very highest evidence of title is in the election in which the relator received the highest number of votes. Our statue is imperative that the person having the highest number of votes given for any office filled by the votes of a single county shall be declared duly elected, and a certificate of his election shall be made out by the returning officer of the county, and delivered, on demand, to the person elected. Code, sec. 874.
The commissioner of registration was in this case a mere returning officer, as such he had no judicial power. The ballot was conclusive upon him. He had no *253 power to reject a single ballot, or in any manner to adjudicate upon the validity of the election as returned to him by the judges. The mental operation of computing the vote, and the manual act of issuing the certificate, exhausted his powers, and having once counted the vote and issued the certificate to the relator, his functions and his duties were alike at an end. He had no power to amend his returns upon a rejection of the vote of the Tenth ward. The act was arbitrary and without warrant of law. There was a tribunal of public justice designated by law where alone the vote of the Tenth ward could be rejected, if it was lawful and proper to reject it. Whether so lawful and proper or not, is a question with which we have nothing to do. The functions of the returning officer are ministerial only He can count the vote, and file the returns, and issue the certificate, and this is all. The County Court will then induct into office, and this is also a ministerial act and not a judicial one. Vid. 3 Hum., 233; 4 Sneed, 291; Code, sec. 354. But the title comes at last from an election by the people, and neither the certificate nor the induction can supply the place of it. 45 Missouri, 344, 453; 17 Arkansas R., 407; 5 Col., 588, State v. Steers; Bright’s Election Cases, 305. Thus it is said when the board of canvassers assumes to reject returns transmitted to it on other grounds than those appearing on its face, or to declare persons elected who are not shown by the returns to have received the requisite plurality, it is usurping functions. The returning officer is a ministerial officer; he is not *254 vested with judicial powers to correct errors and mistakes that may have accrued with any officer who preceded him in the performance of his duty, or to pass upon any disputed fact which may affect the result. He is to receive the returns, if in due form, as correct. He is to ascertain and declare the result as shown by such return. If other matters are introduced into the return than those. which the law provides, they are to that extent unofficial. Cooly Const. Lim., 622. Upon this question there can be no doubt, and to this efFect are the authorities in an unbroken current. Thus in the case of The People v. Van Slyck, 4 Cow., 297, it is held that the duty of the canvasser is ministerial only. They are to calculate and ascertain the whole number of votes and make their certificate. The duty is not judicial, but ministerial. He has no power to controvert the votes of the electors. So in Morgan v. Quackenbush, 22 Barb., 77, it is said the canvasser is not at liberty to receive evidence of anything outside of the returns themselves; his duty consists in a simple matter of arithmetic; he is to bring together the returns made by the inspectors, and ascertain, by computation, the number of votes given, and declare the result by his certificate. And so in Thompson v. Ewing, 1 Brewst., 77, “they have no power to inquire into a question of fraud, for that would make them judges of a contested election. Their duty is simply to cast up the vote and make out a certificate thereof.” And in New Jersey, in the case of the State v. The Governor, the Chief Justice said the board of canvassers had no authority to look outside of the returns *255 and consider the regularity of the election. In Indiana, it is held, they have no right to determine any question connected with the elections but to cast up the votes from the proper election documents, and declare the person elected who has the highest number of votes. Brown v. O’Brien, 2 Indiana, 423; State v. Jones, 19 Indiana, 356. And so in Illinois they are not clothed with any discretionary power. They are not allowed to reject any returns. 29 Illinois, 422; 15 Illinois, 500. In the People v. Head, 25 Illinois, 328, it is said, they may herhaps judge whether the returns are in proper form, but after that they can only compute the votes and declare the result. And when their duty is done in this respect, says Cooly, they have no power afterwards to reconsider their determination and come to a different conclusion. Cooly Const. Lim., 623; Hadly v. Mayor, 33 New York, 603.
The officer known in this State, in a late system of laws, as the “ commissioner of registration,” was but the sheriff’s substitute in the matter of holding elections. The sheriff as a returning officer had no discretion. The sheriff was a ministerial officer only, and so was he. So far as his functions as an officer of registration proper is concerned, it was said in Staten’s case, 6 Col., that in the matter of determining upon what was called the “loyalty” of the citizen who was before him as a mendicant for the right of suffrage, his action was judicial. This may be so, but it is absolutely certain that under our laws he had no judicial powers as a mere returning officer. It re- *256 suits that the extraordinary conduct of this officer in rejecting the vote of the Tenth ward was an arbitrary usurpation of power; that his powers were exhausted by his first computation and certificate thereof to the relator, and that all his subsequent action was without the warrant of law.
The title to the office of sheriff of Shelby county was determined by the election of March 26th, 1870, by which the relator was shown to have received a majority of the votes. That title must stand unquestioned until, in some judicial proceeding, the invalidity of that election is made to appear. The relator is, as the case is presented here, entitled to the office.
Let the decree be affirmed and a judgment of ouster entered.